UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X          04 CV 2743 (NG) (VVP)
BRYAN LONEGAN; OLIVIA CASSIN; JANET
SABEL; YVONNE FLOYD-MAYERS;
JENNIFER BAUM; and MARIANNE YANG,

                    Plaintiffs,

          -against-                                                     OPINION AND ORDER

DENNIS HASTY; DAVID RARDIN; JAMES
SHERMAN; SALVADOR LOPRESTI;
WILLIAM BECK; JOHN OSTEEN;
LAYTEMA JAMES; RICHARD DIAZ; and
REYNALDO ALAMO,

                    Defendants.
-------------------------------------------------------------X

GERSHON, United States District Judge:

          Plaintiffs, who are attorneys employed by the Legal Aid Society of New York, claim that,

by secretly recording their conversations with certain detainees at the federal Bureau of Prisons'

Metropolitan Detention Center ("MDC"), located in Brooklyn, New York, defendants, a former

warden of MDC and other employees of the Bureau of Prisons ("BOP"), violated Title III of the

Omnibus Crime Control and Safe Streets Act of 1968, as amended (the "Wiretap Act" or "Title III"),

18 U.S.C. §§ 2510-2522, and the Fourth and Fifth Amendments of the U.S. Constitution. The

former warden, Dennis Hasty, moves the court pursuant to Federal Rule of Civil Procedure 12(b)(6)

to dismiss plaintiffs' complaint on a variety of grounds, including qualified immunity. For the

reasons set forth below, plaintiffs' Fifth Amendment claim is dismissed, and Hasty's motion is

otherwise denied.

## FACTS

For purposes of the motion to dismiss, all factual allegations set forth in the complaint are accepted as true and all reasonable inferences are drawn in favor of plaintiffs.[1]

In connection with the federal government's investigation of the terrorist attacks that occurred on September 11, 2001, 84 individuals ("Detainees") were arrested and detained at MDC on immigration charges. Detainees remained at MDC for approximately eleven months. During most of that time period and at all times relevant to this case, defendant Dennis Hasty was the warden of MDC. Hasty retired in April 2002 and was succeeded as warden by Michael Zenk. None of the Detainees were charged with criminal activity related to terrorism, although some were charged with other crimes. Most of them were eventually deported.

### Conditions of Detention

At MDC, inmates who are deemed to pose a heightened security risk are segregated from the general population in an area called the Special Housing Unit ("SHU"). In September 2001, one wing of the SHU was modified to enable confinement of the Detainees in the most restrictive and secure conditions permitted by BOP policy. The modified wing was called the "administrative maximum SHU" or "ADMAX SHU." It was separated from the rest of the SHU by an area

---

[1]Following oral argument on this motion, plaintiffs amended their complaint to add claims against additional defendants. The amended complaint does not assert any new claims against Hasty; however, some of the factual allegations directed at the additional defendants concern Hasty as well. For purposes of this motion, the court relies only on the factual allegations against Hasty that appear in both the original complaint and the amended complaint and not on any additional allegations to which Hasty has not as yet had the opportunity to respond.

containing a holding cell, a lieutenant's office, and a visiting area (the "Visiting Area"). The Visiting Area consisted of three adjacent meeting spaces, each divided by a metal wall approximately three feet high and a thick glass partition that extended from the top of the wall to the ceiling, preventing physical contact between inmates and visitors. Whenever a Detainee was taken from his cell, he would be escorted by three officers and a lieutenant at all times. During routine escorts on the ADMAX SHU, Detainees were handcuffed behind their backs and placed in leg restraints. When escorted to visits, Detainees were handcuffed in front, restrained in waist chains, and placed in leg restraints; after visits, they were pat-searched or strip-searched.

On October 5, 2001, in response to allegations by a Detainee that he had been physically abused by MDC officers, MDC instituted a policy requiring officers to videotape Detainees whenever they were outside of their assigned cells. Subsequently, this policy was adopted by the BOP. In a memorandum dated October 9, 2001, the BOP Northeast Regional Director instructed all wardens in the region, including Hasty, to videotape post-September 11th detainees whenever they were escorted outside of their cells in order to deter unfounded allegations of abuse.

### Plaintiffs' Meetings with Detainees

In October 2001, one of the Detainees telephoned the Legal Aid Society to request legal assistance. In response, plaintiffs Olivia Cassin and Bryan Lonegan went to MDC to meet with the Detainee. Subsequently, the Legal Aid Society received requests for legal assistance from other Detainees. Between October 23, 2001 and December 31, 2001, plaintiffs conducted approximately 30 meetings with various Detainees at MDC. The purpose of the meetings was to provide the Detainees with legal advice and, in some instances, to assist them in securing representation from

other attorneys. Nearly all of the meetings took place in the Visiting Area.

A regulation promulgated by the United States Department of Justice ("DOJ"), codified at 28 C.F.R. § 543.13(e), which was in effect during the time period at issue and remains in effect at present, prohibits auditory monitoring of attorney-client meetings at federal prisons. On October 31, 2001, the Attorney General issued a directive, codified at 28 C.F.R. § 501.3(d), authorizing auditory monitoring of such meetings under limited circumstances, which include that the monitoring be approved by the Attorney General based on reasonable suspicion that a particular inmate may use communications with attorneys to facilitate acts of terrorism and that prior notice be given to both the inmate and the inmate's attorney.

Plaintiffs allege that they had an expectation of privacy when meeting with Detainees. Some plaintiffs observed videocameras positioned near the Visiting Area and asked MDC officers whether the cameras were on. They were told that the cameras were not on. Subsequent to the issuance of the Attorney General's directive, plaintiffs asked MDC officers whether their meetings with Detainees were being recorded pursuant to its terms. They were told that the meetings were not being recorded.

**The OIG Investigation**

In March 2003, the Office of the Inspector General ("OIG") of the DOJ began a comprehensive administrative investigation into alleged abuse of Detainees by MDC officers.[2] The results of this investigation were published in a December 2003 report entitled "Supplemental Report

---

[2]The administrative investigation grew out of an earlier criminal investigation, at the end of which federal prosecutors declined to file criminal charges.

on September 11 Detainees' Allegations of Abuse at the Metropolitan Detention Center in Brooklyn, New York" (the "OIG Report"), which is annexed to plaintiffs' complaint as Exhibit 1 and incorporated therein by reference.[3] Hasty, who retired in April 2002, did not participate in the investigation, but his successor, Michael Zenk, did. The information that Warden Zenk provided to OIG investigators concerning events during Hasty's tenure was based on briefings by staff members.

The investigation uncovered evidence of physical and verbal abuse of Detainees by MDC officers. In addition, the investigation revealed efforts by MDC officers to interfere with Detainees' access to legal counsel. Detainees were denied regular access to the telephone for the purpose of making legal phone calls. OIG Report at 42. And, their meetings with attorneys were routinely recorded. OIG Report at 31-33, 44.

In connection with its investigation, OIG requested that MDC produce all videotapes of Detainees. MDC officers resisted this request, stated that many such tapes had been destroyed in the normal course of business, and delayed in producing the tapes that were not alleged to have been destroyed. OIG Report at 39-42. On August 20, 2003, investigators visiting MDC discovered in a storage room 308 videotapes, the existence of which had not been made known to OIG. With respect to these tapes, the OIG Report states: "We took the 308 newly discovered videotapes to

---

[3]In June 2003, OIG had issued a report evaluating the treatment of all 762 individuals who were detained throughout the country following September 11th. *See* U.S. Dep't of Justice, Office of the Inspector General, *The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks* (June 2, 2003), *available at* http://www.usdoj.gov/oig/special/0306/full.pdf. Chapter 7 of that report addressed the treatment of Detainees at MDC. It concluded that the conditions to which Detainees were subject were "excessively restrictive" and "unduly harsh," but noted that the investigation of physical and verbal abuse was not complete and that its findings would be detailed in a separate report. The OIG Report annexed to the complaint sets forth those additional findings.

review. These 308 tapes provided much of the evidence discussed in this report corroborating many of the [D]etainees' allegations. Many of the tapes contradicted statements of MDC staff members about the treatment of the [D]etainees." OIG Report at 41 (footnote omitted). The OIG Report goes on to note that "even with these newly discovered tapes, significant gaps existed in the MDC's production of videotapes. For example,. . . . many tapes start or stop in the middle of [D]etainees' escorts. There are also no tapes from some 'use of force' incidents [i.e., incidents in which Detainees alleged improper use of force by MDC personnel]." OIG Report at 41. Viewing the videotapes led OIG investigators to conclude that many MDC officers "lacked credibility." OIG Report at 42. The videotapes revealed that "some staff members engaged in the very conduct they specifically denied in their interviews," which caused investigators "to question the credibility of these staff members and their denials in other areas for which we did not have videotape evidence." OIG Report at 42.

The videotapes showed that during the period from October 2001 to February 2002, meetings between Detainees and their attorneys were routinely recorded by videocameras that captured both sound and visual images. In relevant part, the OIG Report states:

> We found that MDC staff members not only videotaped the [D]etainees' movements when taken from their cells to visit with their attorneys, they also recorded [D]etainees' visits with their attorneys using videocameras set up on tripods outside the attorney visiting rooms. In total, we found more than 40 examples of staff videotaping [D]etainees' attorney visits. On many videotapes, we were able to hear significant portions of what the [D]etainees were telling their attorneys and sometimes what the attorneys were saying as well.

> It appeared that [D]etainees' attorney visits were recorded intentionally. On one occasion, an officer instructed the [D]etainee not to speak in Arabic with his attorney because the meeting was being videotaped. In another videotape, a lieutenant told the [D]etainee and his attorney that he had been instructed that they were required to speak in English during the visit. We also observed on several occasions that officers lingered outside the attorney visiting rooms and appeared to

be listening to the conversations.

\* \* \*

When interviewed prior to the OIG obtaining all of the videotapes, MDC Warden Michael Zenk told the OIG that, initially, attorney visits were video and audio taped, but in November 2001, after one of the attorneys complained, the video camera was moved far enough away that the audio of the visits was not recorded. However, as late as February 2002, conversations between [D]etainees and their attorneys are still audible on many of the tapes. When confronted with this information, Warden Zenk stated that the visits should not have been audio taped. He also said his staff thought moving the camera away from the attorney visiting rooms ensured that the visits would not be audio taped.

Recording the [D]etainees' attorney visits also was not necessary for the MDC's security purposes. The attorney visits took place in non-contact rooms separated by thick glass, and the MDC required the [D]etainees to be restrained in handcuffs, leg restraints, and waist chains during the visits. The [D]etainees also were pat searched or strip searched after these meetings.

OIG Report at 31-32 (footnotes omitted). The OIG Report indicates that neither the October 9, 2001 memorandum instructing wardens to videotape the Detainees' movements nor any subsequent memorandum from the BOP authorized the recording of verbal communications between attorneys and Detainees. OIG Report at 39. On the contrary, a memorandum dated December 18, 2001 from the BOP Northeast Regional Director noted that audiotaping meetings between Detainees and attorneys was prohibited. OIG Report at 32. The OIG Report also notes that the BOP's Office of General Counsel told investigators that officers at MDC had not been authorized by the Attorney General, pursuant to the October 31, 2001 directive, to monitor meetings between Detainees and their attorneys. OIG Report at 32.

# DISCUSSION

## I.    Standard of Review

A complaint may not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A complaint is deemed to include any written instrument attached to it as an exhibit and any documents incorporated in it by reference. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In deciding whether a complaint states a claim, the court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002).

The court may not use a pleading standard that exceeds the pleading requirements set forth in the Federal Rules of Civil Procedure to evaluate the sufficiency of a complaint on a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-14 (2002). Rule 8(a)(2) provides that a complaint need include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Such a statement must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 512 (quoting *Conley*, 355 U.S. at 47). This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. *Id.* Other provisions of the Federal Rules of Civil Procedure are inextricably linked to Rule 8(a)'s simplified notice pleading standard. For example, Rule 8(e)(1) states that "[n]o technical forms of pleading or motions are required," and Rule 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice." Fed. R. Civ. P. 8(e)(1), (f); *Id.* at 513-14. Given the Federal Rules' simplified standard for pleading, "[a] court may dismiss a

complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz*, 534 U.S. at 514 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## II.      General Principles of Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The standard for evaluating a defendant's entitlement to qualified immunity is thus an objective one, focusing on what a reasonable official in the defendant's position would have thought under the circumstances, not what the particular defendant asserting the defense actually thought.  *See id.*

Although immunity issues should be resolved at the earliest possible stage in the litigation, a defendant asserting a qualified immunity defense "on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).  Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief.  *Id.*  Thus, the plaintiffs are entitled to all reasonable inferences from the facts alleged, not only those that support their claims, but also those that defeat the immunity defense.  *Id.*

A claim of qualified immunity requires a two step inquiry.  First, the court must determine

whether the facts alleged show that the defendant's conduct violated a statutory or constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If so, the second step is for the court to ask whether the right was clearly established at the time that the violation occurred. *See id.* This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *Id.* Nevertheless, an officer is not entitled to qualified immunity simply because he or she confronted a novel factual situation; if, in the light of pre-existing law, the unlawfulness of the officer's actions would have been apparent, then the qualified immunity defense must fail. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would have been clear to a reasonable officer that his or her conduct was unlawful in the situation that the officer confronted. *Saucier*, 533 U.S. at 202.

In assessing a qualified immunity defense, courts must consider in particular: (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether, under pre-existing law, a reasonable defendant official would have understood that his or her acts were unlawful. *Pena v. Deprisco*, 432 F.3d 98, 115 (2d Cir. 2005).

## III. Wiretap Act Claims

Congress enacted the Wiretap Act, in large part, to create procedures for electronic surveillance by government officers that comply with the requirements of the Fourth Amendment as articulated by the Supreme Court. *See United States v. United States District Court*, 407 U.S. 297, 302 (1972) [hereinafter *Keith*] ("Much of Title III was drawn to meet the constitutional requirements for electronic surveillance enunciated by this Court."); *Mitchell*, 472 U.S. at 532.

Subject to certain specified exceptions, not relevant here, the Wiretap Act prohibits the intentional interception of wire, oral, and electronic communications unless specifically authorized by a court order. *See* 18 U.S.C. §§ 2510-22. Those who violate the Act are subject both to criminal prosecution and civil liability. 18 U.S.C. §§ 2511, 2520. In addition, communications intercepted in violation of the Act are precluded from use as evidence in any legal proceeding. 18 U.S.C. § 2515. Privileged communications retain their privileged character notwithstanding interception, regardless of whether they were intercepted in accordance with the Act. 18 U.S.C. § 2517(4).

Plaintiffs claim that the alleged recording of their conversations with Detainees violates the Wiretap Act and that, as a result, they are entitled to recover civil damages from defendants. Hasty argues that plaintiffs' Wiretap Act claims against him must be dismissed on several grounds: (1) the claims are time-barred; (2) plaintiffs lack a private right of action against him; and (3) the complaint does not establish the requisite elements of a Wiretap Act violation. He also asserts entitlement to qualified immunity.

### A.    *Statute of Limitations*

The Wiretap Act provides that: "A civil action under this section may not be commenced later than two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). Hasty argues that plaintiffs had a reasonable opportunity to discover the alleged violations at the time of their occurrence because plaintiffs observed videocameras in the Visiting Area during their meetings with Detainees. The presence of the cameras, Hasty contends, put plaintiffs on notice of the possibility that their conversations were being recorded and gave rise to a duty to investigate. Because the violations are alleged to have

occurred on or before December 31, 2001, Hasty argues that the statute of limitations expired, at the latest, on December 31, 2003 and that plaintiffs' claims under the Wiretap Act are now time-barred.

Hasty fails to acknowledge that plaintiffs did investigate the videocameras on first observing them. According to the complaint, plaintiffs asked MDC officers whether the cameras were recording them, as well as whether their conversations were being monitored pursuant to a directive of the Attorney General, and were told "no" in response to both questions. In light of the denial by MDC officers, plaintiffs' allegations support an inference that their first reasonable opportunity to discover the alleged violations did not come until the results of the OIG investigation were made public in 2003. As a result, plaintiffs' claims under the Wiretap Act, first asserted in the complaint dated July 1, 2004, will not be dismissed as untimely.

### B.    *Private Right of Action Under Section 2520*

Section 2511(1)(a) of the Wiretap Act provides:

> Except as otherwise specifically provided in this chapter any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1)(a). Thus, three kinds of activities are subject to liability under Section 2511(1)(a): (1) intercepting any wire, oral, or electronic communication, (2) endeavoring to intercept any wire, oral, or electronic communication, and (3) procuring another person to intercept or endeavor to intercept any wire, oral, or electronic communication.

The procedures for recovering civil damages are set forth in 18 U.S.C. § 2520. Prior to a 1986 amendment of the Wiretap Act, Section 2520 provided:

> Any person whose wire or oral communication is intercepted . . . in violation of this chapter shall (1) have a civil cause of action against any person who intercepts . . . or procures any other person to intercept . . . such communications, and (2) be entitled to recover from any such person [damages, attorney's fees and costs].

18 U.S.C. § 2520 (1982).  The amended statute now provides:

> [A]ny person whose wire, oral, or electronic communication is intercepted . . . in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520 (2000).

Relying on a decision by the Court of Appeals for the Fifth Circuit, Hasty argues that the amendment eliminates the private right of action that existed under the original statute against parties who engage in the third kind of activity proscribed by Section 2511(1)(a), namely, procuring another person to intercept a wire, oral, or electronic communication. *See Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 168-69 (5th Cir. 2000), *cert. denied*, 532 U.S. 1051 (2000).  In reaching its conclusion in *Peavy*, the Fifth Circuit relied solely on what it found to be the plain language of the statute.  *Id*. At 169 ("Because the plain language of the statute is unambiguous, resort to the legislative history for its interpretation is *not* necessary.").

To me, the more natural reading of the amended statute shows no intent on the part of Congress to eliminate the private right of action for procurement violations.  In relevant part, the amended statute provides that "any person whose wire, oral, or electronic communication is intercepted . . . in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation . . ." 18 U.S.C. § 2520 (2005).  Pursuant to Section 2511(1)(a), the class of persons whose communications are intercepted in violation of the Wiretap Act includes those persons whose communications are intercepted by someone who was procured to do so by a third party.  In such case, both the person who actually intercepted the communications and the

person who procured the interception have violated the Act, and the victim is authorized to sue any person or entity who engaged in that violation.

Review of the legislative history supports the conclusion that Congress intended to streamline the language of the provision by using the blanket phrase "person or entity which engaged in that violation" rather than delineating each kind of violation separately– but that it did not, in so doing, intend to eliminate procurement violations from civil liability. Although the Senate report explains most of the statutory changes rendered by the 1986 amendment in meticulous detail, it is silent concerning the portion of Section 2520 at issue here, suggesting that the changes to that portion were cosmetic rather than substantive. *See* S. Rep. No. 95-797, at 26-27 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3555, 3580-81 (discussing changes to the civil liability provisions of the Wiretap Act).

But even if Congress did eliminate the private right of action against those who procure the interception of protected communications, plaintiffs' Wiretap Act claims cannot be dismissed. As an alternative to their procurement theory of liability, plaintiffs assert that Hasty intercepted their communications directly. Therefore, even if the procurement theory fails, the direct interception theory is sufficient to support the claims.[4] *See Directv Inc. v. Barrett*, 311 F. Supp. 2d 1143, 1146 (D. Kan. 2004).

---

[4]There is a disagreement between the parties over the evidence required to establish Hasty's liability on a direct interception theory. Hasty contends that he cannot be held liable unless the evidence establishes that he physically pressed the "record" button on the camera. Plaintiffs, in contrast, contend that Hasty can be held liable under the doctrine of *respondeat superior*. Since the complaint states a claim, there is no need at this time to determine the exact scope of evidence necessary to prove the claim. The parties will have an opportunity to develop the evidence in discovery.

## C.     Elements of a Wiretap Act Violation

Hasty argues that plaintiffs have failed to establish the elements of a Wiretap Act violation in three respects: (1) plaintiffs have not alleged facts sufficient to show that the substance of their communications were actually recorded; (2) plaintiffs have failed to allege that Hasty acted with the requisite degree of intent; and (3) plaintiffs' conversations with Detainees do not constitute "oral communications" within the meaning of the statute.

### 1.     Actual Recording of Plaintiffs' Communications

Hasty argues that plaintiffs have failed to allege that the substance of their communications with Detainees was actually recorded.  He contends that plaintiffs' reliance on the OIG Report to establish this element of a Section 2511(1)(a) violation is misplaced because the report does not identify the attorneys whose communications with Detainees were recorded.  "Plaintiffs," Hasty says, "apparently *assume* their conferences were among those that were audio taped."  Defendant's Mem. at 11.

Plaintiffs allege that, collectively, they met with Detainees approximately thirty times between October 23, 2001 and December 31, 2001.  The OIG Report indicates that at least forty attorney-client conferences were recorded during a period that includes those dates.  From those facts, a reasonable inference can be drawn that some of plaintiffs' meetings with Detainees were among those recorded.  Contrary to Hasty's assertions, evidentiary support for the inference is not required at this stage of the litigation. *See Swierkiewicz*, 534 U.S. at 514.

## 2.    *Requisite Degree of Intent*

Section 2511(1)(a) imposes liability only on those who act intentionally.  18 U.S.C. § 2511(1)(a).  The Court of Appeals for the Second Circuit has defined the *mens rea* element of the Wiretap Act as follows:  "Before you can find that the defendant acted intentionally, you must be satisfied . . . that the defendant acted deliberately and purposefully; that is, defendant's act must have been the product of defendant's conscious objective rather than the product of a mistake or accident." *United States v. Townsend*, 987 F.2d 927, 930 (2d Cir. 1993) (suggesting model language for use in a jury charge).  Hasty argues that plaintiffs fail to allege that he acted with the requisite degree of intent.   But the complaint alleges that Hasty "intentionally" violated the Wiretap Act.  Original Complaint at ¶ 34; Amended Complaint at ¶ 42.  Furthermore, the OIG Report concludes that "[i]t appeared that [D]etainees' attorney visits were recorded intentionally," based on observations of prison officers, on some occasions, instructing Detainees to converse with their attorneys in English and, on other occasions, eavesdropping outside the Visiting Area.  OIG Report at 31.  These allegations are sufficient to satisfy the *mens rea* element of the statute for the purposes of a motion to dismiss.

Hasty argues alternatively that the following portion of the OIG Report contradicts plaintiffs' allegations that he acted with intent:

> When interviewed prior to the OIG obtaining all of the videotapes, MDC Warden Michael Zenk told the OIG that, initially, attorney visits were video and audio taped, but in November 2001, after one of the attorneys complained, the video camera was moved far enough away that the audio of the visits was not recorded.  However, as late as February 2002, conversations between detainees and their attorneys are still audible on many of the tapes.  When confronted with this information, Warden Zenk stated that the visits should not have been audio taped.  He also said his staff thought moving the camera away from the attorney visiting rooms ensured that the visits would not be audio taped.

OIG Report at 32.   Hasty fails to acknowledge, however, that the OIG Report does not credit Warden Zenk's secondhand account of the events at issue.   Rejecting the warden's explanation that the alleged audiotaping that occurred between November 2001 and February 2002 was inadvertent, the OIG Report concludes that "[i]t appears that [D]etainees' attorney visits were recorded intentionally," OIG Report at 31, and that "officers improperly and illegally recorded [D]etainees' meetings with their attorneys," OIG Report at 47.

Ultimately, the veracity of contentions by MDC officers that the alleged audiotaping was inadvertent is an issue for the trier of fact to determine at the appropriate stage of the litigation.   The task of the court in ruling on a Rule 12(b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)).


### 3.    *"Oral Communications"*

As defined by the Wiretap Act, an "oral communication" is "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation."  18 U.S.C. § 2510(2).  Hasty argues that plaintiffs could not have had a justified expectation that their communications with Detainees were not subject to interception when those communications "took place in a highly secure prison environment where surveillance was the order of the day."  Defendant's Mem. at 13.  He is incorrect.  The Wiretap Act "clearly applies to prison monitoring."  *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987), *cert. denied*, 485 U.S. 1021 (1988).  Here, in light of the federal regulations prohibiting officers from

recording meetings between attorneys and prison inmates except under narrow circumstances not present here, *see* 28 C.F.R. §§ 543.13(e) and 501.3(d), and the specific representations from MDC officers that plaintiffs' conversations with Detainees were not being recorded, plaintiffs' expectations that their conversations with Detainees were not subject to interception were justified. (Further confirmation that, on the face of the complaint, plaintiffs' expectations were justified appears below in the analysis of their reasonable expectation of privacy for Fourth Amendment purposes.)

### D.    *Qualified Immunity*

In light of the foregoing, I find that the facts alleged in the complaint, if proven, would establish that Hasty violated plaintiffs' rights under the Wiretap Act to engage in oral communications with Detainees in the Visiting Area without having those communications intentionally intercepted. Accordingly, Hasty's entitlement to qualified immunity depends on whether those rights were clearly established at the time of the alleged violations.[5] *See Saucier*, 533 U.S. at 201.

Since 1987, the Second Circuit has consistently held that, absent a court order or an applicable statutory exception, the Wiretap Act prohibits prison officers from intercepting conversations involving prisoners. *See United States v. Friedman*, 300 F.3d 111, 120-23 (2d Cir. 2002), *cert. denied*, 538 U.S. 981 (2003); *United States v. Workman*, 80 F.3d 688, 692-94 (2d Cir.

---

[5]Although some courts have held that qualified immunity is not available as a defense to violations of the Wiretap Act, *see, e.g.*, *Berry v. Funk*, 146 F.3d 1003, 1013-14 (D.C. Cir. 1998), courts in this Circuit have routinely allowed defendants to raise the defense in Wiretap Act cases, *see, e.g.*, *In re State Police Litigation*, 888 F. Supp. 1235, 1266-68 (D. Conn. 1995), *appeal dismissed*, 88 F.3d 111 (2d Cir. 1996); *Lukas v. Triborough Bridge and Tunnel Authority*, 1993 WL 597132, *9 (E.D.N.Y. Sept. 15, 1993); *Falk v. County of Suffolk*, 781 F. Supp. 146, 151 (E.D.N.Y. 1991).

1996), *cert. denied*, 519 U.S. 938 (1996) and 519 U.S. 955 (1996); *United States v. Willoughby*, 860 F.2d 15, 19-20 (2d Cir. 1988), *cert. denied*, 488 U.S. 1033 (1989); *Amen*, 831 F.2d at 378-80.

In *Amen*, co-defendants convicted of drug offenses and racketeering argued, on direct appeal of their convictions, that the trial court erred in denying their motion to suppress tapes of telephone calls that they made and received while confined at the United States Penitentiary at Lewisburg ("Lewisburg"). The defendants contended, *inter alia*, that the recording of their telephone calls by prison officers violated the Wiretap Act. *Id.* at 378. Rejecting the government's argument that the Wiretap Act does not apply to conversations that take place in prison, the court held that "Title III clearly applies to prison monitoring." *Id.* Nevertheless, the court found that the Wiretap Act was not violated because the monitoring of prisoners' telephone calls at Lewisburg fell within the statute's consent exception.[6] "[Defendants] impliedly consented to the interception of their telephone calls by use of the prison telephones," the court said. "They were on notice of the prison's interception policy from at least four sources:" (1) certain provisions of the Code of Federal Regulations, (2) a mandatory inmate orientation lecture in which the taping system is discussed, (3) an inmate handbook that is distributed to each inmate upon arrival, and (4) notices posted on each telephone stating the following in English and Spanish:

> The Bureau of Prisons reserves the authority to monitor conversations on this telephone. Your use of institutional telephones constitutes consent to this monitoring. A properly placed telephone call to an attorney is not monitored.

*Id.* at 379.

Subsequently, in *Willoughby*, the record established that the Metropolitan Correction Center,

---

[6] The Wiretap Act's prohibition on the interception of wire, oral, and electronic communications does not apply when the interceptor is "acting under color of law" and "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c).

a federal detention facility in New York, had a policy and practice of automatically recording and randomly monitoring all inmate calls, other than those properly placed to an attorney, made on institutional telephones, and that notice of this policy and practice was given to all inmates. As in *Amen*, the court held that, although the Wiretap Act generally prohibits the warrantless interception of prisoners' communications, the interception at issue fell within the consent exception to the statute. *Willoughby*, 860 F.2d at 19-20. The court reached the same conclusion in *Workman*, involving a challenge to the lawfulness of the interception of telephone calls made by inmates at a New York State prison. *Workman*, 80 F.3d at 693. *Friedman* involved a challenge to the lawfulness of the interception of telephone calls made by inmates at a California jail. *Friedman*, 300 F.3d at 111. In that case, the court found that the notice given to prisoners was insufficient to satisfy the consent exception to the statute, but that the recordings fell within another exception to the Wiretap Act, one for communications intercepted by "an investigative or law enforcement officer in the ordinary course of his duties." *Id.* at 122; 18 U.S.C. § 2510(5)(a).

Although the prison telephone cases focus on the exceptions to the general rule, they clearly establish what the general rule is, namely, that the Wiretap Act prohibits prison officers from intercepting communications involving prisoners without court authorization.[7] These cases also demonstrate that, in the prison setting, attorney-client communications generally are distinguished

---

[7]Hasty does not argue that either the consent exception or the ordinary course of law enforcement duties exception applies here. On the face of the complaint, there is no basis for applying the consent exception because plaintiffs allege that they did not have notice that their conversations with Detainees were being recorded. Likewise, the facts alleged in the complaint provide no basis for applying the ordinary course of law enforcement duties exception because, in allegedly recording attorney-client meetings, defendants were not acting pursuant to federal policy but, rather, were violating it. *See* 28 C.F.R. § 543.13(e); 28 C.F.R. § 501.3(d); *cf. State Police Litigation*, 888 F. Supp. at 1267 ("Defendants cannot plausibly argue that Congress intended the recording of privileged or private conversations in violation of the Constitution . . . to fall under Title III's definition of 'law enforcement duties.'").

from other kinds of communications and exempted from routine monitoring.

An offshoot of this line of cases, *In re State Police Litigation*, 888 F. Supp. 1235 (D. Conn. 1995), *appeal dismissed*, 88 F.3d 111 (2d Cir. 1996), confirms that plaintiffs' rights under the Wiretap Act were clearly established at the time of the alleged violations in this case. In *State Police Litigation*, the plaintiffs brought a civil rights action pursuant to 42 U.S.C. § 1983 against state police officials who implemented a policy of recording all telephone calls to and from state police barracks. The court certified a plaintiff class composed of all persons who unknowingly made recorded calls to or from state police facilities during a certain period of time; class members included criminal defense attorneys whose clients were detained at state police facilities. Plaintiffs claimed that the recording of their conversations violated their rights under various constitutional and statutory provisions, including the Wiretap Act. Defendants moved for summary judgment arguing, *inter alia*, that they were entitled to qualified immunity. The court denied the motion in relevant part, stating: "In sum, plaintiffs' rights under Title III were defined adequately by court decisions and the Act itself during the period in question, and a reasonable official in defendants' position would have understood that the acts alleged by plaintiffs were unlawful under Title III." *Id.* at 1267. On an interlocutory appeal, defendants conceded that, on plaintiffs' version of the facts, plaintiffs' rights under the Wiretap Act were clearly established. After a lengthy analysis of the district court's decision, the Second Circuit dismissed the appeal for lack of appellate jurisdiction, agreeing with the district court that material issues of fact precluded an award of summary judgment based on qualified immunity.

In addition to the Wiretap Act itself and the cases discussed above, the federal regulation prohibiting prison officers from monitoring attorney-client meetings except under narrow

circumstances not present here would have put a reasonable officer in Hasty's position on further notice that surreptitious recording of plaintiffs' meetings with Detainees was unlawful. *See* 28 C.F.R. § 543.13(e); 28 C.F.R. § 501.3(d); *cf. Groh v. Ramirez*, 540 U.S. 551, 564 (2004) (indicating that a Bureau of Alcohol, Tobacco and Firearms guideline put agents on notice that they could be held liable for executing a manifestly invalid warrant and, therefore, was relevant to an analysis of an agent's entitlement to qualified immunity); *Hope*, 536 U.S. at 741-44 (reasoning that a regulation promulgated by the Alabama Department of Corrections requiring that corrections officers employ certain procedural safeguards when using a hitching post to discipline prisoners on a chain gang put officers on notice that failure to employ those procedures would render use of the hitching post unconstitutional under existing law); *State Police Litigation*, 888 F. Supp. at 1260, 1267-68 (finding that, in light of a state police manual indicating that calls between lawyers and clients could not be monitored under any circumstances and an advisory opinion by the state attorney general indicating that police may not utilize wiretaps without judicial authorization, no reasonable police officer would believe that the recording of conversations between arrestees and their attorneys was lawful) (noted in *State Police Litigation*, 88 F.3d at 121); *see also Tellier v. Fields*, 280 F.3d 69, 86 (2d Cir. 2000) ("[W]e simply cannot accept that [the doctrine of qualified immunity] would ever confer protections on egregious violations of a federal regulation. This Court will not confer immunity on any official who glaringly disregards the very regulations that he or she is entrusted to discharge dutifully and in good faith."). The December 18, 2001 memorandum, advising wardens that audio-taping attorney meetings with Detainees was prohibited, would have provided a reasonable warden with additional notice that recording plaintiffs' communications with Detainees was beyond the legitimate scope of his or her duties.

22

In sum, on the face of the complaint, no reasonable officer in Hasty's position could have believed that recording plaintiffs' communications with Detainees without prior judicial authorization was permitted by the Wiretap Act. Accordingly, Hasty is not entitled to qualified immunity with respect to plaintiffs' Wiretap Act claims. *See Saucier*, 533 U.S. at 202; *Pena*, 432 F.3d at 115.

## IV.    Fourth Amendment Claims

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The protection afforded by the Fourth Amendment against unreasonable searches and seizures "governs not only the seizure of tangible items, but extends as well to the recording of oral statements." *Katz v. United States*, 389 U.S. 347, 353 (1967). The applicability of the Fourth Amendment depends on two things: "first, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 361 (Harlan, J., concurring). If those prerequisites are met, then the court must determine whether the search or seizure at issue was reasonable. In the context of electronic surveillance, a search and seizure is presumed to be unreasonable unless authorized in advance by a warrant. *See Katz*, 389 U.S. at 359.

### A.    Reasonable Expectation of Privacy

Hasty does not argue that the court should find the seizure of plaintiffs' communications to be reasonable under the Fourth Amendment despite the absence of a warrant. Instead, he argues that, as a matter of law, the Fourth Amendment does not apply to the seizure of plaintiffs' communications because plaintiffs did not have a reasonable expectation of privacy in their conversations with Detainees. In particular, Hasty contends that any subjective expectation of privacy that plaintiffs had was objectively unreasonable given that the conversations took place in a prison setting, that the physical layout of the Visiting Area was inconsistent with an expectation of privacy, that the presence of video cameras in the vicinity of the Visiting Area put plaintiffs on notice that their conversations were subject to recording, and that the Detainees were being held in connection with an investigation of terrorist acts.

Hasty's arguments provide insufficient basis to dismiss plaintiffs' Fourth Amendment claims. Plaintiffs allege that they had an expectation of privacy in their conversations with Detainees, and the facts alleged in the complaint support an inference that their expectation was reasonable. Any factual issues raised by Hasty cannot be decided on this motion to dismiss.

To begin with, the question of whether society is prepared to accept as reasonable plaintiffs' expectation of privacy in their conversations with Detainees is not governed by a *per se* rule concerning prisons. Rather, it requires an analysis that considers not only where the conversations occurred, but, also, the nature of the conversations, the specific circumstances in which they occurred, and the relationships of the participants. *See id*. at 351 ("The Fourth Amendment protects people, not places.").

The conversations at issue here consisted of communications between attorneys and their

clients who were seeking legal advice.[8]  Attorney-client communications have a special status in our

legal system; their confidential nature is protected by the attorney-client privilege.   The oldest

privilege for confidential communications recognized by law, the attorney-client privilege is intended

to encourage full and frank communication between attorneys and their clients and thereby promote

broader public interests in the observations of law and the administration of justice.  *Swidler &*

*Berlin v. United States*, 524 U.S. 399, 403 (1998); *Upjohn Company v. United States*, 449 U.S. 383,

389 (1981).  The Supreme Court has long recognized that the attorney-client privilege "is founded

upon the necessity, in the interest and administration of justice, of the aid of persons having

knowledge of the law and skilled in its practice, which assistance can only be safely and readily

availed of when free from the consequences or the apprehension of disclosure."  *Hunt v. Blackburn*,

128 U.S. 464, 470 (1888).  For those reasons, "courts have by reason and experience concluded that

a consistent application of the [attorney-client] privilege over time is necessary to promote the rule

of law by encouraging consultation with lawyers, and ensuring that lawyers, once consulted, are able

to render to their clients fully informed legal advice."  *In re Grand Jury Investigation*, 399 F.3d 527,

531 (2d Cir. 2005).  Although the privilege afforded to attorney-client communications generally

belongs to the client, not to the attorney, *see United States v. Goldberger & Dubin, P.C.*, 935 F.2d

501, 504 (2d Cir. 1991), the existence of robust protections for attorney-client communications

makes plaintiffs' expectation of privacy in their conversations with Detainees reasonable.

---

[8]Hasty repeatedly characterizes the Detainees as *prospective* clients of plaintiffs, but makes no argument on that basis.  For purposes of the analysis here, whether the Detainees were clients or prospective clients makes no difference.   The attorney-client privilege applies to preliminary discussions about representation between a lawyer and prospective client, even where the lawyer ultimately declines to provide representation or the client decides not to employ the lawyer.  2 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 182 (2d ed. 1994); *see United States v. Dennis*, 843 F.2d 652, 656 (2d Cir. 1988).

The reasonableness of plaintiffs' expectation was not vitiated because the conversations took place in a prison.[9]  In *Katz*, Justice Harlan declared that, while "a man's home is, for most purposes, a place where he expects privacy, . . . objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected.'"  *Katz*, 389 U.S. at 361 (Harlan, J., concurring).  Conversely, while a prison is not, for most purposes, a place where a person expects privacy, privileged communications between attorneys and clients, the recording of which is prohibited both by statute and regulation, as discussed above, are protected by the Fourth Amendment from government eavesdropping, especially when those communications take place in the area of the prison designated for attorney-client meetings. *Cf. Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection."); *State Police Litigation*, 888 F. Supp. at 1256 ("[W]here conversations consist of privileged communications between clients and their attorneys, an expectation of privacy is reasonable."); *Al Odah v. United States*, 346 F. Supp. 2d 1, 8-15 (D.D.C. 2004) (denying the government's application to conduct real time monitoring of meetings between attorneys and post-September 11th detainees held at Guantanamo Bay Naval Base because such monitoring would "impermissibly burden the attorney-client relationship and abrogate the attendant attorney-client privilege.").

The prison telephone cases, discussed above, support the conclusion that plaintiffs'

_____

[9]Hasty's reliance on the line of cases holding that a convicted prisoner lacks a reasonable expectation of privacy within his or her prison cell, *see, e.g., Hudson v. Palmer*, 468 U.S. 517, 525-26; *Willis v. Artuz*, 301 F.3d 65, 69 (2d Cir. 2002), is misplaced. The plaintiffs here were not convicted prisoners, nor were they visiting convicted prisoners.  And the conversations that were recorded by defendants did not occur in the Detainees' cells, but, rather, in the Visiting Area, which, it is reasonable to infer from the allegations in the complaint, was the place to which plaintiffs were directed by prison officers for the conduct of attorney-client interviews with Detainees.

expectation of privacy in their attorney-client communications with Detainees was reasonable. All of the prisons discussed in those cases exempted attorney-client telephone calls from their general monitoring programs. *See, e.g., Willoughby*, 860 F.2d at 20 ("Prisoners have no reasonable expectation of privacy in their calls to *nonattorneys* on institutional telephones.") (emphasis added).

Hasty argues that the physical layout of the Visiting Area was inconsistent with a reasonable expectation of privacy because "[t]he meeting space itself allowed multiple conferences to occur at once, such that conversations were susceptible to being overheard." Defendant's Mem. at 17. The allegations contained in the complaint, however, provide no basis for concluding that multiple conferences took place at any of the times that plaintiffs met with Detainees or that the meetings were overheard by third parties. Whether the circumstances surrounding any particular meeting negated an otherwise reasonable expectation of privacy is a question for the trier of fact to consider at the appropriate stage of the litigation. Hasty's argument that the presence of video cameras in the vicinity of the Visiting Area put plaintiffs on notice that their conversations were subject to recording likewise is unavailing. As described above, plaintiffs were told by prison officers that the video cameras were not recording their conversations with Detainees.

Finally, Hasty contends that, because of the Detainees' status as persons of interest in an investigation of terrorist acts, prison officers had a heightened security interest in monitoring their communications, which rendered plaintiffs' expectations of privacy unreasonable. Hasty does not explain, however, how audiotaping conversations between Detainees and their attorneys served to promote prison security. The OIG Report specifically concludes that recording the Detainees' meetings with attorneys "was not necessary for the MDC's security purposes" because the meetings took place in non-contact rooms in which attorneys and Detainees were separated by thick glass,

Detainees were always restrained in handcuffs, leg restraints, and waist chains during the visits, and Detainees were pat searched or strip searched after the meetings.

The Detainees' status as persons of interest in the government's investigation of September 11th does not render plaintiffs' expectation of privacy in their communications with Detainees unreasonable. That an individual is held in connection with an investigation of terrorist acts does not render that individual– or his or her attorney– ineligible for the protections of the Fourth Amendment. *See Katz*, 389 U.S. at 360 (Marshall, J., concurring) ("[S]pies and sabateurs are as entitled to the protection of the Fourth Amendment as suspected gamblers."); *see also Mitchell*, 472 U.S. at 534 (holding that the Attorney General violated the Fourth Amendment when, without a warrant, he authorized electronic surveillance of members of an antiwar organization who were plotting to blow up tunnels in Washington, D.C. and to kidnap the National Security Advisor); *Keith*, 407 U.S. at 320 (holding that defendants accused of conspiring to bomb a Central Intelligence Agency office in Michigan were protected by the Fourth Amendment from warrantless electronic surveillance by government officers).

In sum, the facts alleged in the complaint, if proven, would establish that, in secretly recording plaintiffs' meetings with Detainees, defendants violated plaintiffs' Fourth Amendment rights.

### B.     *Qualified Immunity*

To determine whether Hasty is entitled to qualified immunity with respect to plaintiffs' Fourth Amendment claims, the court must now consider whether plaintiffs' rights were clearly established at the time that the alleged recording took place. *See Saucier*, 533 U.S. at 201.

"Eavesdropping is an ancient practice which at common law was condemned as a nuisance." *Berger v. New York*, 388 U.S. 41, 45 (1967). Since *Berger*, the Supreme Court has recognized that, in the absence of a constitutionally sound warrant, electronic eavesdropping is prohibited by the Fourth Amendment. *Id*. at 45-63 (invalidating a New York statute that authorized electronic eavesdropping by law enforcement officers pursuant to court order on the ground that the procedures for obtaining a court order were not sufficient to comply with the Warrants Clause of the Fourth Amendment). In *Katz*, where the Supreme Court overturned the petitioner's conviction because it was based, in part, on evidence obtained without a warrant through an electronic listening and recording device attached to the outside of a public telephone booth, the Court declared "the procedure of antecedent justification" to be "a constitutional precondition of the kind of electronic surveillance involved in this case." *Katz*, 389 U.S. at 359.

In 1968, as discussed above, Congress enacted the Wiretap Act, *inter alia*, to create procedures for electronic surveillance that comply with the requirements of the Fourth Amendment articulated in *Berger* and *Katz*. *See Keith*, 407 U.S. at 302; *Mitchell*, 472 U.S. at 532. In general, the Wiretap Act prohibits the intentional interception of wire, oral, and electronic communications unless such interception is authorized in advance by court order. *See* 18 U.S.C. §§ 2510-2522. Detailed procedures for obtaining court authorization are set forth in the Act. *See* 18 U.S.C. §§ 2516, 2518.

In *Keith*, the Supreme Court held that the Fourth Amendment's prohibition on warrantless electronic surveillance applies with equal force in cases in which a governmental interest in national security is implicated. *Keith*, 407 U.S. at 320. The case arose from the prosecution of three defendants charged with conspiracy to bomb a Central Intelligence Agency office. The district court

granted defendants' motion to compel the government to disclose certain electronic surveillance information gained through warrantless wiretapping and to conduct a hearing to determine whether the information tainted the government's evidence against defendants. The government petitioned the Sixth Circuit for a writ of mandamus, arguing that the electronic surveillance was lawful, though conducted without prior judicial approval, as a reasonable exercise of the President's Article II power to protect national security; the court of appeals denied the writ. The Supreme Court affirmed, holding that the warrantless electronic surveillance at issue violated the Fourth Amendment. "We recognize," the Court declared, "the constitutional basis of the President's domestic security role, but we think it must be exercised in a manner compatible with the Fourth Amendment. In this case we hold that this requires an appropriate warrant procedure." *Id.* at 320. Notably, the Court maintained, as it had in *Katz*, that retroactive validation of warrantless electronic surveillance was not consistent with the Fourth Amendment. "It may well be," the Court said, "that, in the instant case, the Government's surveillance of [defendant's] conversations was a reasonable one which readily would have gained prior judicial approval . . . . [Nevertheless, the] Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. This judicial role accords with our basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government." *Id*. at 317; *accord Katz*, 389 U.S. at 356.

Subsequently, in *Mitchell*, a civil action for damages based on the Attorney General's 1970 authorization of a warrantless wiretap on the telephone of a member of an antiwar group that, according to the Federal Bureau of Investigation, "had made plans to blow up heating tunnels linking federal office buildings in Washington, D.C., and had also discussed the possibility of kidnaping

then National Security Adviser Henry Kissinger," *Mitchell*, 472 U.S. at 513, the Court held that, pursuant to *Keith*, the Attorney General's actions violated the Fourth Amendment, *id.* at 534. (However, since the wiretap was authorized two years prior to the Court's decision in *Keith*, the Court held that the Attorney General was entitled to qualified immunity. *Id.* at 535.)

By clearly establishing the contours of the Fourth Amendment in this area, the decisions in *Keith* and *Mitchell* foreclose Hasty's claim of qualified immunity based on the Detainees' status as persons of interest in a terrorism investigation. Although neither *Keith* nor *Mitchell* reached the question of whether the Fourth Amendment prohibits the President or an agent of the President from authorizing warrantless electronic surveillance to gain information about foreign, as opposed to domestic, threats to national security, that distinction is not relevant here since Hasty was not authorized by the Attorney General to act as he did. *See* OIG Report at 32.

Hasty's final argument is that it was not clearly established that the right, under the Fourth Amendment, to be free of warrantless electronic surveillance applied inside a prison. He relies on *Riddick v. Baker*, 1997 WL 221133 (E.D. Pa. Apr. 28, 1997), *aff'd*, 159 F.3d 1353 (3d Cir. 1998), in which a former inmate at a state prison sued prison guards under 42 U.S.C. § 1983 claiming, *inter alia*, that the guards violated his Fourth Amendment rights by eavesdropping through an intercom system, without a warrant, on conversations that he had with his attorney. Following a bench trial, on defendants' motion for judgment, the court ruled that the prison guards were entitled to qualified immunity on plaintiff's Fourth Amendment claim because "a prisoner does not have a 'clearly established" Fourth Amendment right to have his conversations with his attorney be free of governmental eavesdropping." *Id.* at *2.

Put simply, in my view, this broad statement is not supported by the relevant law, including

the law relied on by the court in *Riddick*. For example, the sole Second Circuit case cited in *Riddick*, *Christman v. Skinner*, 468 F.2d 723 (2d Cir. 1972), did not, as the court said, denounce a prisoner's Fourth Amendment right to privacy in communications with counsel; it simply applied the rule announced by the plurality in *Lanza*, that an individual generally is not entitled to a reasonable expectation of privacy in conversations that take place in the visiting area of a prison. *Christman*, 468 F.2d at 726; *Lanza*, 370 U.S. at 143-44. The visitor at issue in *Christman* was the plaintiff's sister, not his attorney. *Christman*, 468 F.2d at 728 (Feinberg, J., concurring in part and dissenting in part). In *Lanza*, the Court specifically excluded attorney-client conversations from its holding. *See Lanza*, 370 U.S. at 143-44.

In addition, unlike in this case, the eavesdropping in *Riddick* occurred in a state prison where prison officers were not bound by the federal regulations restricting auditory monitoring of attorney-client meetings. *See* 28 C.F.R. § 543.13(e); 28 C.F.R. § 501.3(d). And the attorney-client meeting in *Riddick* did not take place in an area designated by the prison for attorney-client visits; because plaintiff's counsel arrived at the prison after the designated visiting area was closed, he met with the plaintiff in the "shakedown room," a room adjoining the visiting area where inmates are searched after visits and which contains an intercom system.

In contrast to *Riddick*, the *State Police Litigation* case, decided in this Circuit prior to *Riddick*, explicitly endorsed the right of a prisoner, under the Fourth Amendment, to have conversations with his or her attorney free of governmental eavesdropping and the corresponding right of an attorney, under the Fourth Amendment, to have conversations with an incarcerated client free of governmental eavesdropping. The plaintiff class in *State Police Litigation*, which included criminal defense attorneys, asserted violations of their Fourth Amendment rights in addition to

violations of their rights under the Wiretap Act. The court held that, "where no consent exists, and where conversations consist of privileged communications between clients and their attorneys, an expectation of privacy is reasonable." *State Police Litigation*, 888 F. Supp. at 1256. As with the plaintiffs' Wiretap Act claims, the defendants conceded on appeal that, on the plaintiffs' version of the facts, the rights underlying the plaintiffs' Fourth Amendment claims had been clearly established at the time the recordings were made. *State Police Litigation*, 88 F.3d at 125.

In sum, at the time of the events at issue in this case, it was clearly established in this Circuit that plaintiffs had a constitutionally protected reasonable expectation of privacy in their communications with Detainees. A reasonable warden in Hasty's position would have been aware of the policies and regulations of his or her own agency prohibiting prison officers from recording attorney-client communications except under narrow circumstances not present here. A reasonable warden would also have been aware of the Wiretap Act's prohibition on the interception of oral communications, created, in part, to comply with the requirements of the Fourth Amendment, and the case law discussed above confirming that the Wiretap Act applies within the prison setting. And he or she would have been aware not only of the decisions in *Berger*, *Katz*, *Keith*, and *Mitchell*, but also of the decisions in *State Police Litigation*, which serve to eliminate any possible doubt that the act of recording conversations that took place in the Visiting Area between plaintiffs and Detainees violated the Fourth Amendment. Accordingly, on the facts alleged in the complaint, Hasty is not entitled to qualified immunity with respect to plaintiffs' Fourth Amendment claims. *See Saucier*, 533 U.S. at 202; *Pena*, 432 F.3d at 115.

### D. Hasty's Level of Personal Involvement

Plaintiffs' claims for damages for defendants' alleged violations of the Fourth Amendment are authorized by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971). In an action seeking damages for a constitutional deprivation pursuant to *Bivens*, as in an action pursuant to Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983, the liability of a defendant may not be predicated on the doctrine of *respondeat superior*; personal involvement is a prerequisite to liability. *See Ellis v. Blum*, 643 F.2d 68, 85 (2d Cir. 1981). The required personal involvement of a supervisory officer may be established by evidence that: "(1) the [officer] participated directly in the alleged constitutional violation, (2) the [officer], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [officer] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [officer] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [officer] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring." *Johnson v. Newburgh Enlarged School District*, 239 F.3d 246, 254 (2d Cir. 2001) (discussing supervisory liability in the context of a Section 1983 claim).

Hasty contends that a *Bivens* claim against a supervisory officer such as himself cannot withstand a motion to dismiss unless it alleges specific, nonconclusory facts that demonstrate the officer's direct involvement in the alleged constitutional deprivation. But the heightened pleading standard called for by defendant is not permissible under *Swierkiewicz*. *See Swierkiewicz*, 534 U.S. at 512; *see also Elmaghraby v. Ashcroft*, 2005 WL 2375202, *11-12 (E.D.N.Y. Sept. 27, 2005) (rejecting defendants' argument that a plaintiff must allege "a quantum of nonconclusory facts" to

survive a motion to dismiss a *Bivens* action).

From the facts alleged in the complaint, a reasonable inference may be drawn that Hasty was personally involved in the recording of plaintiffs' meetings with Detainees. It is reasonable to infer that, as the warden, he was responsible for overseeing a new surveillance initiative directed at a special class of maximum security inmates. The OIG Report also alleges that Hasty failed to remedy the recording after receiving a complaint from an attorney in November 2001. Accordingly, the allegations in the complaint are sufficient to withstand defendant's motion to dismiss. The precise level of Hasty's involvement in the alleged constitutional deprivations is a matter that is appropriately the subject of discovery.

## IV.    Fifth Amendment Claims

The touchstone of due process is protection of the individual against arbitrary action by government. *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). Conduct by a federal officer that is "so egregious, so outrageous, that it may fairly be said to shock the conscience" violates the substantive due process guarantee of the Fifth Amendment. *Id.* at 847 n.8; *accord Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005). Plaintiffs claim that defendants' conduct in secretly audio taping their conversations with Detainees constitutes a violation of substantive due process, relying in part on *Fajeriak v. Alaska*, which holds that "[t]he spectacle of the state spying on attorney-client communications of persons placed in its custody offends even the least refined notions of fundamental fairness and due process of law." *Fajeriak v. Alaska*, 520 P.2d 795, 799 (Alaska 1974).

Nevertheless, plaintiffs cannot maintain a claim for violation of substantive due process. When a provision of the Constitution provides an explicit textual source of protection, a court must

assess a plaintiff's claims under that explicit provision and not the more generalized rubric of substantive due process. *Conn v. Gabbert*, 526 U.S. 286, 293 (1999); *Velez*, 401 F.3d at 94. As plaintiffs acknowledged at oral argument, their substantive due process claims arise from the same conduct by defendants, and seek a remedy for the same injuries, as their Fourth Amendment claims. Accordingly, plaintiffs' Fifth Amendment claims for violation of substantive due process are dismissed.

## CONCLUSION

For the reasons set forth above, defendant Hasty's motion to dismiss is granted with respect to plaintiffs' Fifth Amendment claims, and is otherwise denied.

**SO ORDERED.**

_____/S/_____
**NINA GERSHON**
**United States District Judge**

Dated:  Brooklyn, New York
　　　　June 22, 2006